**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of T.C <br><br> Arlene Cuevas, <br><br>             Petitioner, <br><br>    v. <br><br> Gerome Cuevas <br><br>            Respondent. | Case No. _____ |

## PETITION FOR WARRANT IN LIEU OF WRIT OF HABEAS CORPUS AND PETITION FOR RETURN OF THE CHILD TO PETITIONER

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 et seq.**

### I. Preamble

1.  This Petition is brought by Arlene Cuevas ("Mrs Cuevas" or "Petitioner"), to secure the return of her seven-year-old daughter T██████ C██████ ("The Child"), who was, without Petitioner's consent or acquiescence, wrongfully removed from Australia and brought to the Eastern District of New York by child's father, Respondent Gerome Cuevas ("The Respondent).

2.  This petition is filed pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act (hereinafter "ICARA") 22 U.S.C. § 9001.  The Convention came into effect in the United States of America on July 1, 1988 and was also ratified between the United States of America and Australia on July 1,

---

[1]  T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986), a copy of which is attached hereto as Exhibit A.

1988.  A copy of the Hague Convention and ICARA are annexed here as **Exhibit A** and **B**, respectively.

3.  The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.  Convention, art. 1.

4.  The Convention applies to cases in which one parent wrongfully removes and retains his or her child, who is under the age of sixteen (16) years, from the child's "habitual residence" in breach of the other parent's custodial rights, which were being exercised at the time of the wrongful retention of the child. Hague Convention, Art. 3.

5.  Petitioner respectfully requests that pursuant to Articles 1(a) and 12 of the Convention, this Court order that the child be returned to Australia, the child's habitual residence.

## II. Jurisdiction and Venue

6.  This Court has jurisdiction pursuant to 22 U.S.G. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

7.  Venue is proper pursuant to 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because, upon information and belief, the Child and Respondent are residing at 11-47 45th Av, Apt 2, Long Island City, NY, 11101 in the Eastern District of New York; and because this case involves the removal and retention of a child under the age of sixteen from his habitual residence of Australia to the United States of America.

### III. History of the Case and Status of Petitioner and Child

8. The Petitioner and the Respondent are the parents of the Child. They were married on January 17, 2009 in the Philippines. The parents remain married under Australian and Filipino Law.

9. The Child was born to the Petitioner on ██████████████ in the Philippines. A copy of the child's birth certificate is annexed hereto as **Exhibit C.**

10. Petitioner and Respondent moved to Australia with the Child on March 8, 2015 on a Work (Skilled) Visa issued to the Petitioner in connection with her work as an Information Technology Professional for Accenture, where Petitioner has worked for thirteen (13) years. It was envisioned and intended at the time that the parties' move to Australia would be permanent.

11. The Child is now seven (7) years old.  The Convention applies to cases where a child under the age of sixteen (16) years has been removed from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

12. The parties lived together with the child in the parties' marital residence, with a shared intent to remain in Australia, as of August 2015. Petitioner was employed full-time in Melbourne, Australia at Accenture. Respondent had searched for, and acquired full-time work, commencing in August 2015 as a receptionist at a local hotel.

13. Respondent wrongfully removed the minor child from Australia on August 24, 2015 and has wrongfully retained the minor child in a foreign jurisdiction since that time.

14. At the time of the abduction of the Child from Australia, the Petitioner had and continues to have rights of custody under Australian law in terms such that the removal of the Child from

Australia is in violation of Australian law and is a wrongful removal within the meaning of Articles 3 and 5 of the Convention.

15. At the time of the Respondent's wrongful removal and retention of the Child, the Petitioner was actually exercising custody rights within the meaning of Articles Three and Five of the Convention, in that she is the mother of the Child, was residing with the child, and has exercised custody rights over the Child since she was born.

16. Furthermore, the Child was habitually resident in Australia within the meaning of Article 3 of the Convention from March 2015 until her wrongful removal from Australia on or about August 24, 2015. A copy of a letter certifying the child's attendance at school and health insurance coverage is annexed hereto as **Exhibit D** and **E**, respectively.

17. On August 23, 2015 the Petitioner and the Respondent had a very serious argument during which the Respondent told the Petitioner that he would be leaving her. The Respondent confiscated the Petitioners phone when she attempted to call law enforcement. Respondent then left the marital home with the Child.

18. On or around August 24, 2015, the Respondent left Australia for the Philippines, aided or abetted by officials of Iglesia Ni Cristo[2] ("Church of Christ"), a Filipino Church, without the knowing or consent of the Petitioner[3]. This was only discovered by the Petitioner after her family notified her that Respondent and the child were back in the Philippines on August 25, 2015.

---

[2] Both parties have been members of this church since birth and were active members at the time of the abduction. Both parties were voluntary finance officers with the church and due to their move to Australia had to transfer their church records/registration to the local church offices in Melbourne, Australia. The Church requires attendance on every Thursday and Sunday and discourages the involvement of outside parties, especially the police and/or the legal system in any personal disputes.

[3] Petitioner informed me that he was speaking to church officials the night of August 23, 2017.

4

19. Petitioner filed a police report with the Victoria Police at Flinders Lane police station, but they were not able to assist her after Respondent left the country. Respondent finally contacted Petitioner sometime in late August and they began communicating primarily through the messaging app "Viber". Petitioner would constantly ask Respondent about his plans to return to Australia. On September 14, 2015, Respondent told Petitioner that he wanted to return to Australia and even offered to pay the costs of getting permanent residency in Australia for himself and T.C.

20. Petitioner also had sporadic contact with T.C. after the abduction, but that ceased on October 14, 2015. Her last contact directly with Respondent was on September 25, 2015. All further attempts at contact by the Petitioner went unanswered. Petitioner's calls to Respondent's mobile went unanswered, as did her text messages, and she was blocked from contacting him on Facebook.

21. Furthermore, Respondent's family in the Philippines refused to provide information to the Petitioner and her family as to the whereabouts of the Respondent and the Child. From October 2015 until December 2016, the Petitioner made continual efforts to locate the Respondent and the child. However, she faced obstruction and silence from the Respondent, his family and the Church of Christ who would not provide information on the location of the Respondent or the Child until she returned to active membership within the Church. The Petitioner's efforts to locate the Child during this time included but were not limited to:

> ➢ Working with the International Social Service ("ISS") in Australia. A copy of a ISS correspondence on behalf of Petitioner is annexed hereto as **Exhibit F.**

> ➢ Seeking the assistance of the Victoria Police.

➢ Seeking the assistance of INTERPOL.

➢ Contacting the Filipino Consulate in Victoria, Australia.

➢ Sought legal advice from attorneys in Australia.

➢ Sought legal advice from attorneys in the Philippines.

➢ Meeting with senior administrators within The Church of Christ in both the Philippines and Australia.

➢ Renewing her membership of the Church of Christ.

➢ Contacting members of the Respondent's Family.

➢ Attempting to contact the Respondent.

22. On December 2, 2016, the Petitioner learned through meetings with the officials from the Church of Christ in the Philippines that the Respondent had transferred his church membership to the United States where he has family residing in New York.  On December 2, 2016, the Petitioner contacted the International Social Services in Australia to begin the process of putting together an application under the Hague Convention for the return of the Child.

23. I started searching for addresses of Respondent's family members in New York and was able to find addresses for Ylaine Pablo (cousin), 1125 46th Road, Long Island City, NY 11101, and for Leilani and Noel Mananghaya (cousin), 86-23 77th Street, Queens, NY.  I included this information in my Request for Return filed with the Australian Central Authority.  A copy of the Request is annexed hereto as **Exhibit G.**  Once my case was transferred to the United States Department of State, they confirmed that their records reflect an address for the child as 11-47 45th Avenue, Apt. 2, Long Island City, NY 11101.  A copy of email correspondence from the State Department is annexed hereto as **Exhibit H.**  A subsequent

telephone call with Mr. Robert Weiss from the State Department confirmed that a Lexis-Nexis search was the basis of this address (11-47 45th Avenue, Apt. 2, Long Island City, NY 11101) for Gerome Cuevas as well as for Ylaine Pablo, his cousin.

24. The Child was born on ███████, ████ and will be sixteen (16) years of age on ████████, ████ At the time immediately before the wrongful removal of the Child from Australia, the child habitually resided in Australia within the meaning of Article 3 of the Convention.

25. The residence of the minor child for the last five (5) years is as follows:

> Child's Name: T████ C█████
> Place of Birth: Pasay City, Metro Manila, Philippines
> Birth Date: ███████, ████
> Gender: Female
>
> Period of Residence: October 26, 2009 – March 31, 2010
> Number of Days/Months/Years: 5 months, 5 days
> Address: 3511 Hilario St, Palanan, Makati City, Philippines
> Person Child Lived With: Arlene Cuevas, Gerome Cuevas, Annette Castillo
>
> Period of Residence: April 1, 2010 – March 7, 2015
> Number of Days/Months/Years: 4 years, 11 months, 7 days
> Address: 38 Pao St, Barangay St. Peter, Sta. Mesa Heights, Quezon City, Philippines
> Person Child Lived With: Arlene Cuevas, Gerome Cuevas, Annette Castillo
>
> Period of Residence: March 8, 2015 – August 23, 2015
> Number of Days/Months/Years: 5 months, 16 days
> Address: 804/233 Collins St, Melbourne VIC 3006 Australia
> Person Child Lived With: Arlene Cuevas, Gerome Cuevas

26. Petitioner does not know of any person or institution not a party to the proceedings who has physical custody of the child or claims to have rights of parental responsibilities or legal custody or physical custody of, or visitation or parenting time with the child.

### IV. Wrongful Removal and Retention of Child by Respondent: Claim for Relief Under the Hague Convention

27. A removal or retention of a child is wrongful under Article 3 of the Hague Convention if: (a) the removal of retention is in breach of custody rights attributed to a person, institution, or other body, either jointly or alone, under the law of the state in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention, those custody rights were actually exercised, or would have been exercised, but for the removal or retention of the child. See Hague Convention, Arts. 3 and 5.

28. "Custody rights" under the Hague Convention are defined to include "rights relating to the care of the person of the child, and in particular, the right to determine the child's place of residence." See Hague Convention, Art. 5(a).

29. The child's country of "habitual residence", as defined in Article 3 of the Hague Convention, is Australia, which is where the child habitually resided prior to her wrongful removal to the Philippines and then the United States.

30. Petitioner has a right of custody of the child within the meaning of Articles 3 and 5 of the Convention pursuant to the Family Law Act 1975 which states as follows:

Family Law Act 1975
**SECTION 111B Convention on the Civil Aspects of International Child Abduction**
11IB (4) For the purposes of the Convention:
(a) each of the parents of a child should be regarded as having rights of custody in respect of the child unless the parent has no parental responsibility for the child because of any order of a court for the time being in force; and
(b) subject to any order of a court for the time being in force, a person:
(i) with whom a child is to live under a parenting order; or
(ii) who has parental responsibility for a child under a parenting order;
should be regarded as having rights of custody in respect of the child; and
(c) subject to any order of a court for the time being in force, a person who has parental responsibility for a child because of the operation of this Act or another Australian law and is responsible for the day-to-day or long-term care, welfare and development of the child should be regarded as having rights of custody in respect of the child; and
(d) subject to any order of a court for the time being in force, a person:
(i) with whom a child is to spend time under a parenting order; or

(ii) with whom a child is to communicate under a parenting order; should be regarded as having a right of access to the child.

**SECTION 61B Meaning of *parental responsibility***

In this Part, *parental responsibility*, in relation to a child, means all the duties, powers, responsibilities and authority which, by law, parents have in relation to children.

**SECTION 61C Each parent has parental responsibility (subject to court orders)**

(1) Each of the parents of a child who is not 18 has parental responsibility for the child.

> Note 1: This section states the legal position that prevails in relation to parental responsibility to the extent to which it is not displaced by a parenting order made by the court. See subsection (3) of this section and subsection 61D(2) for the effect of a parenting order.
>
> Note 2: This section does not establish a presumption to be applied by the court when making a parenting order. See section 6IDA for the presumption that the court does apply when making a parenting order.
>
> Note 3: Under section 63C, the parents of a child may make a parenting plan that deals with the allocation of parental responsibility for the child.

(2) Subsection (1) has effect despite any changes in the nature of the relationships of the child's parents. It is not affected, for example, by the parents becoming separated or by either or both of them marrying or re-marrying.

(3) Subsection (1) has effect subject to any order of a court for the time being in force (whether or not made under this Act and whether made before or after the commencement of this section).

31. Following abduction by the Respondent from Australia to the United States, the Child is currently being illegally held in custody, confinement and/or restraint by the Respondent in the State of New York, Queens County.

32. Upon information and belief, Respondent is keeping the Child at 11-47 45th Avenue, Apt. 2, Long Island City, NY, 11101.

33. The Child is now seven (7) years old. The Hague Convention applies to children under sixteen (16) years of age and thus applies to this child. Petitioner has never consented or acquiesced to Respondent's wrongful removal and/or retention of the child.

## V. Provisional Remedies

34. An *ex-parte* motion under the Hague Convention for entry of a TRO, an application for a warrant seeking physical custody of the child, and scheduling of an expedited hearing, and federal rule 65(b) certification of counsel has been filed alongside this petition.

35. Petitioner requests, for the well-being of the children, that she be given immediate access to the children, pending further hearing in this Court.

36. Petitioner requests that the Court issue a show cause order and Warrant and direct that the they be served immediately by United States Marshals on Respondent and that he be brought before this Court with the child forthwith.

37. This Court therefore has the authority to order the immediate appearance of Respondent and the child together.

38. Pending further hearing in this Court, it is requested that this Court issue an immediate order prohibiting the removal of the child from the jurisdiction of this Court and taking into safe-keeping all of the child's travel documents, and setting an expedited hearing on the Petition for Return of the Child.

### VI. Attorney's Fees and Costs

39. To date, Petitioner has incurred attorneys' fees and costs as a result of the wrongful removal of the child by Respondent.

40. Petitioner respectfully requests that this Court award her all costs and fees, including transportation costs, incurred to date as required by 22 U.S.C. § 9007.

41. Petitioner will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of this wrongful removal and retention.

### VII.  Notice of Hearing

42. Pursuant to 22 U.S.C. § 9003(c), Respondent will be given notice of any hearing pursuant to the New York Rules of Civil Procedure.

### VIII.  Warrant in Lieu of Writ of Habeas Corpus

43. Pursuant to Fed R. Civ. P. 65, Petitioner, Arlene Cuevas, hereby moves the Court for an *ex-parte* order temporarily restraining and prohibiting Respondent Gerome Cuevas ("Mr. Cuevas" or "Respondent") from removing the child from this Court's jursidiction and further to direct that the child, together with Respondent, be brought into this Court by any United States Marshal, federal officer or police officer to guarantee their attendance at the hearing.

44. This injunctive relief is vitally necessary on an ex parte basis to prevent irreparable harm to Petitioner. Specifically, under 22 U.S.C. §9001(a) of ICARA, a district court is empowered take appropriate measures "to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition." This is such a case.

45. Unless this Court takes immediate action to bring the Respondent and the child before the Court, irreparable harm will occur to the well-being of the child in that the child is being denied all access to her mother and is being wrongfully detained in New York.  Given the Respondent's documented history of abduction and substantial risk of flight, unless a Warrant is issued, the Respondent will further abduct the child.

46. The Respondent poses a substantial risk of flight for the following reasons:

    a.  The Respondent has close ties to the Philippines, both financial and familial.

    b.  The Philippines, which the Respondent originally removed the Child to affords no remedies for the Child's return under the Hague Convention.

11

c.  The Respondent has already moved the Child to at least two different Countries since the abduction, demonstrating a clear propensity to move between jurisdictions.

d.  The Respondent and the Child are residing illegally in the United States.

e.  The Respondent has availed himself of the assistance of the Church of Christ, a Filipino Church. Both prior to and after the wrongful removal of the Child, officials of the Church of Christ have either provided assistance to the Respondent or else acted to conceal his location from the Petitioner and delay her in efforts to locate the Child. The Church of Christ is an international organization with strong ties to the Filipino expat community, and with the resources to further support the Respondent and has shown itself to already be willing to act in clear contravention of the due process of law.

47. The Petitioner therefore believes that the Child will be carried out of the jurisdiction of this Court or will suffer some irreparable injury unless a Warrant is issued.

## IX.  Relief Requested

**WHEREFORE**, it is respectfully requested that the following relief be granted:

a.  Set an expedited hearing on the petition and communicate that hearing date and time to petitioner so that petitioner may provide notice of these proceedings and the hearing pursuant to ICARA Section 9003(c).

b.  Issue an immediate order that respondent surrender any and all of his passports and all of the passports of the child.

c.  Issue an order following the hearing, directing that the child shall be returned to her Habitual Residence of Australia, pursuant to Article 12 of the Convention.

d.  Issue a warrant seeking physical custody of the child, directing that the child be produced and temporary physical custody be granted to the Petitioner pending further order of the court OR directing that the child, together with Respondent, be brought into this Court by any United States Marshal, federal officer or police officer to guarantee their attendance at the hearing, and

further authorizing such officer to serve Respondent with notice of the hearing and the pleadings filed by Petitioner in this case.

e.   Enter an immediate ex parte temporary restraining order prohibiting the removal of the child from the jurisdiction of this Court pending a hearing on the merits of the Verified Complaint, and further providing that no person acting in concert or participating with Respondent (including Respondent's Paternal Aunt, Yolanda Cuevas-Pablo; Paternal Uncle, Igmidio Cuevas; Paternal Cousin, Ylaine Pablo; Paternal Cousin, Leilani Mananghaya and her Husband, Noel Mananghaya; Paternal Cousin Louie Cuevas; all residents of the State of New York) shall take any action to remove the child from the jurisdiction of this Court pending a determination on the merits of this case;

f.   Issue an order directing Respondent to pay Petitioner for all costs and fees incurred to date by reason of the child's wrongful removal and retention pursuant to 22 U.S.C. § 9007;

g.   any such further relief as justice and its cause may require.

Dated:  October 2, 2017
        New York, New York

Robert D. Arenstein
Attorney for Petitioner
295 Madison Avenue, 16th Floor
New York, New York 10017
(212) 297-6114

13

## VERIFICATION

I, Arlene Cuevas, solemnly declare and affirm under the penalties of perjury and the laws of the United States of America, that I am the petitioner in the within action and have read the foregoing Petition and know the contents of the foregoing Petition are true, to the best of my knowledge, except as to those matters alleged upon information and belief.

Dated:  October 2, 2017
        New York, New York

_____
Arlene Cuevas

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of T.C | ) |
| | ) |
| Arlene Cuevas, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| Gerome Cuevas | ) |
| | ) |
| Respondent. | ) |
| | ) |

Case No. _____

## PETITONER'S MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE AND PETITIONS PURSUANT TO THE HAGUE CONVENTION FOR A TEMPORARY RESTRAINING ORDER, APPLICATION FOR WARRANT SEEKING PHYSICAL CUSTODY OF CHILD, AND SCHEDULING AN EXPEDITED HEARING

1. Petitioner Arlene Cuevas (" Mrs. Cuevas or " Petitioner" ) seeks relief from this Court, in the form of an order for the return of T██████O██████("the child") to Australia under the Convention on the Civil Aspects of International Child Abduction (the " Hague Convention" ). Oct. 25, 1980, T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98 (a copy of the Hague Convention is attached as Exhibit A to the Verified Petition).

2. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.  Convention, art.

3. Specifically, the Petition seeks an order for the return of the Child, under Articles 8 (providing a right of action to a person exercising rights of custody) and 12 (providing for the return of the child as a remedy) of the Hague Convention, as well as under the International Child Abduction Remedies Act ("ICARA" ), 22

1

U.S.C. §§9001-9010 (a copy of the Hague Convention is attached as Exhibit A to the Verified Complaint).

4.   Further, Petitioner urgently needs emergency equitable relief to prevent Respondent Gerome Cuevas ("Mr. Cuevas" or "Respondent") from further interference with Petitioner's rights of custody over their minor child, the Child, who was, without Petitioner's acquiescence or consent, wrongfully removed from Australia by Respondent.

5.   As set forth in Petitioner's Verified Petition for Return of theChild (the "Verified Petition" ), Respondent has wrongfully removed the Child from their place of habitual residence in Melbourne, Australia, in violation of the Hague Convention.

6.   Emergency relief is authorized under 22 U.S.C. §9004(a), which provides that a court may take appropriate measures "to protect the well-being of the child involved *or to prevent the child's further removal or concealment before the final disposition of the petition.*" (Emphasis added.) As discussed below, emergency relief is appropriate here.

## FACTUAL BACKGROUND

7.   The facts are fully laid out in the Verified Petition, but are recited here succinctly for clarity.

8.   Petitioner and Respondent are the parents of the Child. Petitioner and Respondent married on January 17, 2009 and remain married (Verified Petition ¶8)

9.   On ▮▮▮▮▮▮▮▮▮▮, the Petitioner gave birth to the Child in the Philippines. Id. at ¶9. The Child is currently seven years old. The Hague Convention applies to children under sixteen years of age, and thus, applies to the Child.

2

10. From the birth of the child until March 2015 the parties resided with the child in the Philippines. On 8 March 2015, the parties decided to move to Melbourne Australia.

11. The move to Australia was occasioned by a work opportunity for the mother. Id. at ¶10.

12. The Father started work in a Hotel in Melbourne as a receptionist in August 2015. ID. at ¶12.

13. On August 24, 2015 following an argument between the parties, the Respondent wrongfully removed the Child from their habitual residence of Australia, taking them first to the Philippines. The Respondent proceeded to permit contact between the Mother and the Child, and intimated that he would be returning to Australia. Id. at ¶¶17-19.

14. The Respondent proceeded to take the child then onto the United States. Id. at ¶2.

15. At no time did the Petitioner give permit or authorize the removal of the Child from Australia. Id. at ¶32. There are no currently pending legal proceedings in any other jurisdiction related to this matter.

**16.** Upon information and belief, the Child is currently being kept in by the Respondent at 11-47 45th Av, Apt 2, Long Island City, NY, 11101. Id. at ¶31.

## PURPOSES AND PERTINENT PROVISIONS OF THE HAGUE CONVENTION

17. The United States became a "Contracting State" to the Hague Convention on July 1, 1988. The Hague Convention is implemented in the United States by ICARA. The Convention is a reciprocal treaty, in that it is only effective between contracting states.

18. The Convention is to be given uniform international interpretation. 22 U.S.C. 9001. The opinion of sister signatories to the Convention are entitled to significant

3

weight. *Air France v. Saks*, 470 U.S. 392, 404 (1985). "Treaties are construed

more liberally than private agreements, and to ascertain their meaning we may

look beyond the written words to the history of the treaty, the negotiations, and the

practical construction adopted by the parties." *Chocotaw Nation of Indians v.*

*United States*, 318 U.S. 423, 431-432 (1943); *Air France v. Saks*, 470 U.S. 392,

396 (1985); *Sale v. Haitian Ctrs. Council*, 509 U.S. 155 (1993).

19.  Article 1 of the Convention states that the Convention's goals are:

> (a) to secure the prompt return of children wrongfully removed to or retained
> in any contracting State; and
> (b) to ensure that rights of custody and of access under the law of one
> Contracting State are effectively respected in the other Contracting States.

20. Article 3 of the Convention provides, in pertinent part, that:

> The removal or the retention of a child is to be considered wrongful where -
>
> (a) it is in breach of rights of custody of a person... under the law of the State
> in which the child was habitually resident immediately before the removal or
> retention; and
>
> (b) at the time of removal or retention those -rights were actually
>
> exercised, either jointly or alone, or would have been so exercised but for the
> removal or retention.

21. The rights of custody mentioned in sub-paragraph a) above, are those as

determined in the state of the habitual residence of the child, and may arise in

particular by operation of law or by reason of a judicial or administrative decision,

or by reason of an agreement having legal effect under the law of that State.

22. Article 4 of the Convention provides that the Convention "shall apply to any child

who was habitually resident in a Contracting State immediately before any breach

of custody or access rights.

23. Article 5(a) of the Convention provides that, within the meaning of the

Convention, "rights of custody shall include rights relating to the care of the

4

person of the child and, in particular, the right to determine the child's place of residence."

24. In Article 14 The Convention also dictates that "In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable."

25. In the primary source of interpretation for the Convention, the Explanatory Report, Professor E. Perez-Vera noted that any exceptions to the return of the child to her habitual residence:

"...are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter. In fact, the Convention as a whole rests upon the unanimous rejection of this phenomenon of illegal child removals and upon the conviction that the best way to combat them at an international level is to refuse to grant them legal recognition. The practical application of this principle requires that the signatory States be convinced that they belong, despite their differences, to the same legal community within which the authorities of each State acknowledge that the authorities of one of them — those of the child's habitual residence are in principle best placed to decide upon questions of custody and access. As a result, a systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the

5

Convention by depriving it of the spirit of mutual confidence which is its inspiration."[1]

## PETITIONER IS ENTITLED TO EMERGENCY RELIEF

26. Federal courts are empowered to grant temporary restraining orders and preliminary injunctions. See FED. R. CIV. P. 65. Like Federal Rule 65, the Local Rules of this Court authorize the grant of emergency relief. See NY CPLR § 6301.

27. Consistent with Federal Rule 65 and the exigent circumstances that typically exist in Hague Convention cases, Article 2 of the Hague Convention provides: "Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available." October 25, 1980, T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98. The "objects" of the Hague Convention are expressed in Article 1: the prompt return of an abducted child and the protection of the rights of custody.

28. Federal Rule 65 allows this Court to expeditiously promote the Hague Convention's objectives by emergency equitable relief.

29. Applicable state law provisions also support Petitioner's request for expeditious procedures for the return of her Child. N.Y. Dom. Rel. Law § 77-J(1) provides that:

"Upon the filing of a petition seeking enforcement of a child custody determination, the petitioner may file a verified application for the issuance of a warrant to take physical custody of the child if the child is at imminent risk of suffering serious physical harm or of removal from this state."

---

[1] Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law in 3 Acts and Documents of the Fourteenth Session ("Explanatory Report" ), 34, at 22-23

30. Rule 65(b) further provides that "[a] temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party 's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required." FED. R. CIV. P. 65

31. The decision to grant or deny an injunction is "within the sound discretion of the district court." *Int'l Cosmetics Exch., Inc, v, Gapaardis Health & Beauty, Inc.*, 303 F, 3d 1242, 1246 (11th Cir. 2002). "A preliminary injunction may be issued to protect the moving party from irreparable injury and to preserve the power of the trial court to render a meaningful decision on the merits." *Compact Van Equip. Co., Inc. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir. 1978). The Court's task on an application for a preliminary injunction is to find: "(1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if it is issued, would not be adverse to the public interest." *Id.*

32. As explained below, all of the elements for the emergency equitable relief requested herein, including injunctive relief, are satisfied in this case.

***There is a Substantial Likelihood that Petitioner Will Ultimately Prevail on the Merits.***

33. According to the Hague Convention, the removal or retention of a child is wrongful where the removal is in breach of established custody rights defined by

the law of the country in which the child was habitually resident immediately before the removal or retention, and where, at the time of removal, these custodial rights were exercised (either jointly or alone) or would have been so exercised but for the removal. Convention, Art. 3.

34. By virtue of Australian law, the Country of the Child's habitual residence, the Petitioner has custodial rights to the Children. Verified Petition ¶29.

35. Additionally, Petitioner exercised her custodial rights until the wrongful removal.

36. Consequently, Petitioner is likely to prevail on the merits of her petition for the return of the Child.

***The Child was habitual residents of Melbourne, Australia before their abduction.***

37. The fundamental inquiry in any case under the Hague Convention is the habitual residence of the child. The habitual residence in turn dictates the local law to be applied in determining the question of custody rights in the habitual residence.

38. The Child's habitual residence at the date of removal, within the meaning of the Hague Convention, was Australia. The habitual residence is determined at the point in time "immediately before the removal or retention." (art 3).

39. The Second Circuit addressed the question of the meaning of "habitually resident" in *Gitter v. Gitter*, 396 F.3d 124 (2d. Cir. 2005) and *Poliero v Centenaro*, 373 Fed. Appx. 102, 2010 WL 1573771 (2d Cir. 2010).

40. The approach of the Second Circuit is to examine both parental intent and the child's degree of acclimatization to the residence in establishing the habitual residence of the child. This analysis begins with by focusing on the intent of the persons entitled to fix the place of the child's residence, which is most frequently the parents. The intent of the parents is to be determined by both actions and declarations. The second stage of the analysis is to consider the degree to which

the child is acclimatized to the their new surroundings, and whether the degree of acclimatization is such that it can be said that their habitual residence has shifted.

41. In the present case there is a clear parental intent to shift the permanent residency as both parties jointly decided to relocate their entire lives to Australia and openly discussed their plans to receive permanent residency in Australia. The child was attending school in Australia as well.

### *Petitioner was exercising her rights of custody at the time of the Children's wrongful removal.*

42. Article 3 of the Hague Convention provides that a removal is wrongful if it is in violation of the custody rights held by any person, here the petitioner, under that the law of the habitual residence of the child.

43. At the time of the removal of the Child by the Respondent, the Petitioner and the Respondent were a married couple and the parents of the Child.

44. The Family Law Act 1975 of Australia provides that for the purposes of the Hague Convention each of the parents of a child should be regarded as having rights of custody in respect of the child unless the parent has no parental responsibility for the child.

45. The Act further provides that each parent of a child has parental responsibility as defined below:

> *"parental responsibility*, in relation to a child, means all the duties, powers, responsibilities and authority which, by law, parents have in relation to children."

46. Therefore, as the Petitioner is the mother of the child, and there have been no court orders sought or obtained in this matter in Australia, under the law of Australia, the Country of the Child's habitual residence, the Petitioner has custodial rights to the Child.

9

47. Furthermore, as the Verified Petition establishes, the Child has lived with the Petitioner since her birth until the wrongful removal. Clearly, Petitioner was exercising her rights of custody at the time of the Child's wrongful removal. Verified Petition.

48. Petitioner has not waived her rights of custody. Before and after the August 2015 abduction of the Child, Petitioner diligently sought to exercise her custodial rights as well as to locate her child.

### Granting Petitioner's Hague Petition Will Not Terminate Any Right of Custody of Respondent.

49. As shown above, Petitioner is very likely to succeed on the merits of her Hague Convention claim. It should be noted, moreover, that all Petitioner seeks is the Child's return to Australia, their habitual residence, and not any change detrimental to Respondent's own rights of custody.

50. The Hague Convention authorizes a federal district court to determine the merits of a claim for wrongful removal or retention of a child. The Hague Convention does not, however, allow the district court to consider the merits of any underlying custody dispute. *Morris v. Morris*, 55 F. Supp. 2d 1156, 1160 (D. Colo. 1999) (recognizing that "[p]ursuant to Article 19 of the Convention, [this Court has] no power to pass on the merits of custody"). The court's role is not to make traditional custody decisions but to determine in what *jurisdiction* the child should be physically located so that the proper jurisdiction can make those custody decisions. *Loos v. Manuel*, 651 A.2d 1077 (N.J. Super. Ct. Ch. Div. 1994).

51. Stated another way, a district court only has jurisdiction to decide the merits of the wrongful removal claim, as the Hague Convention is intended to restore the pre-abduction status quo and deter parents from crossing borders in search of more

sympathetic courts. *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998) (citations omitted); *Barrios Gil v. Rodriguez*, 184 F. Supp. 2d 1221, 1224 (M.D. Fla. 2002).

***Petitioner will suffer irreparable injury unless equitable relief is granted.***

52. Given that Respondent has already wrongfully removed the Child to the United States and impeded Petitioner's attempt to locate them, there is obviously a risk that Respondent will further hide the Child and himself when he learns that Petitioner is seeking the return of her Child to Australia through the United States.

53. This is precisely the situation envisaged by the District Court in *Morgan v. Morgan*, where construing the Hague Convention and similar provisions under Iowa state law, the district court issued *ex parte* relief because it feared that "if a temporary restraining order is not issued *ex parte*, Mrs. [Respondent] and Mr. [Respondent's boyfriend] will likely flee this jurisdiction with the child upon receiving notice of Mr. [Petitioner's] intent to seek a temporary restraining order preventing them from doing so." 289 F. Supp.2d 1067, 1070 (N.D. Iowa 2003).

54. If Respondent flees with Petitioner's Child again, there will be great difficulty, and it may be impossible, to locate them again.

55. Such a state of affairs would qualify as irreparable injury to the Petitioner on any common sense approach: the separation of a parent from the parent's child is an irreparable injury that can only be rectified by reunion with the child.

56. The risk of Respondent fleeing is especially potent in the present case for the following reasons:

   a. The Philippines, of which the Respondent is a citizen, to which he has financial and family ties, and to which he initially removed the Child, is not a signatory to the Hague Convention.

11

b.  The Respondent has already moved the Child to at least two different Countries since the abduction, demonstrating a clear propensity to move between jurisdictions.

c.  The Respondent and the Child are residing illegally in the United States.

d.  The Respondent has availed himself of the assistance of the Church of Christ, a Filipino quasi-Christian Sect with a wide and powerful international presence. Both prior to and after the wrongful removal of the Child, officials of the Church of Christ have either provided assistance to the Respondent or else acted to conceal his location from the Petitioner and delay her in efforts to locate the Child. The Church of Christ has the resources to further support the Respondent and has shown itself to already be willing to act in clear contravention of the due process of law.

57. The real threat of irreparable injury clearly exists. While it is possible that the Respondent, an illegal alien, will comply with the summons and voluntarily attend a hearing before this federal district court, this Court must be mindful of the fact that, given that Respondent has abducted the child and is himself here illegally, much the greater possibility is that Respondent will ignore the summons and go into hiding, further concealing the child either within or without of the jurisdiction.

58. Petitioner could suffer irreparable injury if the requested relief is not granted. Under these circumstances, emergency equitable relief is authorized under the Hague Convention.

59. ICARA directly speaks to such a remedy. 22 U.S.C. §9004(a) provides that a court may take appropriate measures "to protect the well-being of the child

involved *or to prevent the child's further removal or concealment before the final disposition of the petition.*" (Emphasis added).

60. 22 U.S.C. §9004(a) is subject to §9004 (b) which provides that "No court exercising jurisdiction of an action brought under §9004(b) of this title may, under subsection (a) of this section, order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied". New York State law permits the removal of a child from a person having physical control of the child in cases such as the present (N.Y. Dom. Rel. Law § 77-J(1)).

61. Should this Court decide to prevent the possibility of the Child's removal from its jurisdiction, Petitioner has come to New York for the purpose of caring for the child pending the resolution of this matter.

***The threatened injury to Petitioner outweighs any damage an injunction may cause Respondent.***

62. The potential of Petitioner once again losing the Child outweighs any perceived injury to Respondent. Petitioner merely seeks the restoration of the status quo: the return of the Child to their habitual residence.

63. In *Furnes*, the Eleventh Circuit emphasized the importance of re-establishing the status quo before the alleged wrongful removal: "A return order effectively maintains the status quo with regard to custody of the child. . . A return order will not effect a change in custody. . . because she [Respondent] is free to accompany her child back . . . and retain custody. . . The specific purpose of the Hague Convention was to deter and amend the exact type of abduction in this case, not to bless it." *Furnes v. Reeves*. 362 F.3d 702,717 (11th Cir. 2004) (holding the father had custody rights of the child, and therefore remanded the petition to the trial court in order for it to be granted).

64. The same analysis applies here. Petitioner is not seeking a custody order from this Court. Rather, she seeks the status quo prior to the wrongful abduction, the ability to exercise her rights of custody in Australia, the Child's habitual residence, where her rights should have been properly determined in the first place. Any custody issues will be determined by a court in Melbourne, Australia.

65. The Respondent is no position to complain. Having abducted the child and, through his unilateral, unauthorized conduct, taken her to the United States, he left Petitioner with no choice but to pursue these remedies.

*An injunction, if issued, would not be adverse to the public interest.*

66. The relief Petitioner seeks is authorized under the Hague Convention, an international treaty ratified as between Australia, the United States, and other contracting states. The relief is further consistent with federal and state law implementing the Convention. Indeed, this lawsuit was referred to Petitioner's counsel by the United States Department of State. The Department of State facilitates the provision of legal aid and advice for Hague Convention applicants.

67. There can be no public interest objection raised to the relief sought by Petitioner. The only relevant considerations are whether Petitioner satisfies the requirements of the Hague Convention and the requirements under the Federal Rules of Civil Procedure for the issuance of emergency equitable relief. Those requirements are satisfied here.

**RESPONDENT SHOULD BE ORDERED TO PAY THE COSTS INCURRED BY PETITIONER IN CONNECTION WITH THIS ACTION**

68. Article 26 of the Convention provides that:

Upon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or

14

who prevented the rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

69. ICARA 22 U.S.C. 9007(b)(3) provides that:

Any court ordering the return of a child pursuant to an action brought under section 4 shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees... and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate,

70. As shown above, Respondent's conduct in violation of Petitioner's rights of custody has been flagrant and willful. Accordingly, it is appropriate that an order by this Court at the end of this action directing the return of the Child to Australia be accompanied by an order directing Respondent to pay Petitioner's costs incurred in connection with this action, in an amount to be determined, upon a showing by Petitioner.

## CONCLUSION AND RELIEF SOUGHT

71. For the foregoing reasons, Petitioner asks this Court to grant the following relief:

72. An Order directing a prompt return of the child to her habitual residence of Australia;

   a. Set an expedited hearing on the petition and communicate that hearing date and time to petitioner so that petitioner may provide notice of these proceedings and the hearing pursuant to ICARA Section 9003(c).

   b. Issue an immediate order that respondent surrender any and all of his passports and all of the passports of the child.

c. Issue an order following the hearing, directing that the child shall be returned to her Habitual Residence of Australia, pursuant to Article 12 of the Convention.

d. Issue a warrant seeking physical custody of the child, directing that the child be produced and temporary physical custody be granted to the Petitioner pending further order of the court OR directing that the child, together with Respondent, be brought into this Court by any United States Marshal, federal officer or police officer to guarantee their attendance at the hearing, and further authorizing such officer to serve Respondent with notice of the hearing and the pleadings filed by Petitioner in this case.

e. Enter an immediate ex parte temporary restraining order prohibiting the removal of the child from the jurisdiction of this Court pending a hearing on the merits of the Verified Complaint, and further providing that no person acting in concert or participating with Respondent (including Respondent's Paternal Aunt, Yolanda Cuevas-Pablo; Paternal Uncle, Igmidio Cuevas; Paternal Cousin, Ylaine Pablo; Paternal Cousin, Leilani Mananghaya and her Husband, Noel Mananghaya; Paternal Cousin Louie Cuevas; all residents of the State of New York) shall take any action to remove the child from the jurisdiction of this Court pending a determination on the merits of this case;

f. Issue an order directing Respondent to pay Petitioner for all costs and fees incurred to date by reason of the child's wrongful removal and retention pursuant to 22 U.S.C. § 9007;

g. any such further relief as justice and its cause may require.

Dated: October 2, 2017
   New York, New York

Robert D. Arenstein
Attorney for Petitioner
295 Madison Avenue, 16th Floor
New York, NY 10017
(212) 679-3999

16



HCCH
HAGUE CONFERENCE ON
PRIVATE INTERNATIONAL LAW
CONFÉRENCE DE LA HAYE
DE DROIT INTERNATIONAL PRIVÉ

### 28. CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION[1]

*(Concluded 25 October 1980)*

The States signatory to the present Convention,

Firmly convinced that the interests of children are of paramount importance in matters relating to their custody,

Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access,

Have resolved to conclude a Convention to this effect, and have agreed upon the following provisions –

CHAPTER I – SCOPE OF THE CONVENTION

### Article 1

The objects of the present Convention are –

a)   to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

b)   to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

### Article 2

Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available.

### Article 3

The removal or the retention of a child is to be considered wrongful where –

a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph *a)* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

---

[1] This Convention, including related materials, is accessible on the website of the Hague Conference on Private International Law (www.hcch.net), under "Conventions" or under the "Child Abduction Section". For the full history of the Convention, see Hague Conference on Private International Law, *Actes et documents de la Quatorzième session (1980)*, Tome III, *Child abduction* (ISBN 90 12 03616 X, 481 pp.).

Article 4

The Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights. The Convention shall cease to apply when the child attains the age of 16 years.

Article 5

For the purposes of this Convention –
a)    "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;
b)    "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

CHAPTER II – CENTRAL AUTHORITIES

Article 6

A Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities.
Federal States, States with more than one system of law or States having autonomous territorial organisations shall be free to appoint more than one Central Authority and to specify the territorial extent of their powers. Where a State has appointed more than one Central Authority, it shall designate the Central Authority to which applications may be addressed for transmission to the appropriate Central Authority within that State.

Article 7

Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.
In particular, either directly or through any intermediary, they shall take all appropriate measures –
a)    to discover the whereabouts of a child who has been wrongfully removed or retained;
b)    to prevent further harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures;
c)    to secure the voluntary return of the child or to bring about an amicable resolution of the issues;
d)    to exchange, where desirable, information relating to the social background of the child;
e)    to provide information of a general character as to the law of their State in connection with the application of the Convention;
f)    to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organising or securing the effective exercise of rights of access;
g)    where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisers;
h)    to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;
i)    to keep each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

CHAPTER III – RETURN OF CHILDREN

Article 8

Any person, institution or other body claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child.
The application shall contain –

a)     information concerning the identity of the applicant, of the child and of the person alleged to have removed or retained the child;
b)     where available, the date of birth of the child;
c)     the grounds on which the applicant's claim for return of the child is based;
d)     all available information relating to the whereabouts of the child and the identity of the person with whom the child is presumed to be.

The application may be accompanied or supplemented by –

e)     an authenticated copy of any relevant decision or agreement;
f)     a certificate or an affidavit emanating from a Central Authority, or other competent authority of the State of the child's habitual residence, or from a qualified person, concerning the relevant law of that State;
g)     any other relevant document.

## Article 9

If the Central Authority which receives an application referred to in Article 8 has reason to believe that the child is in another Contracting State, it shall directly and without delay transmit the application to the Central Authority of that Contracting State and inform the requesting Central Authority, or the applicant, as the case may be.

## Article 10

The Central Authority of the State where the child is shall take or cause to be taken all appropriate measures in order to obtain the voluntary return of the child.

## Article 11

The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.

If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of commencement of the proceedings, the applicant or the Central Authority of the requesting State, on its own initiative or if asked by the Central Authority of the requesting State, shall have the right to request a statement of the reasons for the delay. If a reply is received by the Central Authority of the requested State, that Authority shall transmit the reply to the Central Authority of the requesting State, or to the applicant, as the case may be.

## Article 12

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child.

## Article 13

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –

a)     the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

*b)*   there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

### Article 14

In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

### Article 15

The judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State. The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination.

### Article 16

After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice.

### Article 17

The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

### Article 18

The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time.

### Article 19

A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.

Article 20

The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.

CHAPTER IV – RIGHTS OF ACCESS

Article 21

An application to make arrangements for organising or securing the effective exercise of rights of access may be presented to the Central Authorities of the Contracting States in the same way as an application for the return of a child.
The Central Authorities are bound by the obligations of co-operation which are set forth in Article 7 to promote the peaceful enjoyment of access rights and the fulfilment of any conditions to which the exercise of those rights may be subject. The Central Authorities shall take steps to remove, as far as possible, all obstacles to the exercise of such rights.
The Central Authorities, either directly or through intermediaries, may initiate or assist in the institution of proceedings with a view to organising or protecting these rights and securing respect for the conditions to which the exercise of these rights may be subject.

CHAPTER V – GENERAL PROVISIONS

Article 22

No security, bond or deposit, however described, shall be required to guarantee the payment of costs and expenses in the judicial or administrative proceedings falling within the scope of this Convention.

Article 23

No legalisation or similar formality may be required in the context of this Convention.

Article 24

Any application, communication or other document sent to the Central Authority of the requested State shall be in the original language, and shall be accompanied by a translation into the official language or one of the official languages of the requested State or, where that is not feasible, a translation into French or English.
However, a Contracting State may, by making a reservation in accordance with Article 42, object to the use of either French or English, but not both, in any application, communication or other document sent to its Central Authority.

Article 25

Nationals of the Contracting States and persons who are habitually resident within those States shall be entitled in matters concerned with the application of this Convention to legal aid and advice in any other Contracting State on the same conditions as if they themselves were nationals of and habitually resident in that State.

Article 26

Each Central Authority shall bear its own costs in applying this Convention.

Central Authorities and other public services of Contracting States shall not impose any charges in relation to applications submitted under this Convention. In particular, they may not require any payment from the applicant towards the costs and expenses of the proceedings or, where applicable, those arising from the participation of legal counsel or advisers. However, they may require the payment of the expenses incurred or to be incurred in implementing the return of the child.

However, a Contracting State may, by making a reservation in accordance with Article 42, declare that it shall not be bound to assume any costs referred to in the preceding paragraph resulting from the participation of legal counsel or advisers or from court proceedings, except insofar as those costs may be covered by its system of legal aid and advice.

Upon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

Article 27

When it is manifest that the requirements of this Convention are not fulfilled or that the application is otherwise not well founded, a Central Authority is not bound to accept the application. In that case, the Central Authority shall forthwith inform the applicant or the Central Authority through which the application was submitted, as the case may be, of its reasons.

Article 28

A Central Authority may require that the application be accompanied by a written authorisation empowering it to act on behalf of the applicant, or to designate a representative so to act.

Article 29

This Convention shall not preclude any person, institution or body who claims that there has been a breach of custody or access rights within the meaning of Article 3 or 21 from applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention.

Article 30

Any application submitted to the Central Authorities or directly to the judicial or administrative authorities of a Contracting State in accordance with the terms of this Convention, together with documents and any other information appended thereto or provided by a Central Authority, shall be admissible in the courts or administrative authorities of the Contracting States.

Article 31

In relation to a State which in matters of custody of children has two or more systems of law applicable in different territorial units –

a)      any reference to habitual residence in that State shall be construed as referring to habitual residence in a territorial unit of that State;

b)      any reference to the law of the State of habitual residence shall be construed as referring to the law of the territorial unit in that State where the child habitually resides.

Article 32

In relation to a State which in matters of custody of children has two or more systems of law applicable to different categories of persons, any reference to the law of that State shall be construed as referring to the legal system specified by the law of that State.


Article 33

A State within which different territorial units have their own rules of law in respect of custody of children shall not be bound to apply this Convention where a State with a unified system of law would not be bound to do so.


Article 34

This Convention shall take priority in matters within its scope over the *Convention of 5 October 1961 concerning the powers of authorities and the law applicable in respect of the protection of minors*, as between Parties to both Conventions. Otherwise the present Convention shall not restrict the application of an international instrument in force between the State of origin and the State addressed or other law of the State addressed for the purposes of obtaining the return of a child who has been wrongfully removed or retained or of organising access rights.


Article 35

This Convention shall apply as between Contracting States only to wrongful removals or retentions occurring after its entry into force in those States.
Where a declaration has been made under Article 39 or 40, the reference in the preceding paragraph to a Contracting State shall be taken to refer to the territorial unit or units in relation to which this Convention applies.


Article 36

Nothing in this Convention shall prevent two or more Contracting States, in order to limit the restrictions to which the return of the child may be subject, from agreeing among themselves to derogate from any provisions of this Convention which may imply such a restriction.


CHAPTER VI – FINAL CLAUSES


Article 37

The Convention shall be open for signature by the States which were Members of the Hague Conference on Private International Law at the time of its Fourteenth Session.
It shall be ratified, accepted or approved and the instruments of ratification, acceptance or approval shall be deposited with the Ministry of Foreign Affairs of the Kingdom of the Netherlands.


Article 38

Any other State may accede to the Convention.
The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Kingdom of the Netherlands.
The Convention shall enter into force for a State acceding to it on the first day of the third calendar month after the deposit of its instrument of accession.

The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession. Such a declaration will also have to be made by any Member State ratifying, accepting or approving the Convention after an accession. Such declaration shall be deposited at the Ministry of Foreign Affairs of the Kingdom of the Netherlands; this Ministry shall forward, through diplomatic channels, a certified copy to each of the Contracting States.

The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the first day of the third calendar month after the deposit of the declaration of acceptance.

### Article 39

Any State may, at the time of signature, ratification, acceptance, approval or accession, declare that the Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect at the time the Convention enters into force for that State.

Such declaration, as well as any subsequent extension, shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

### Article 40

If a Contracting State has two or more territorial units in which different systems of law are applicable in relation to matters dealt with in this Convention, it may at the time of signature, ratification, acceptance, approval or accession declare that this Convention shall extend to all its territorial units or only to one or more of them and may modify this declaration by submitting another declaration at any time.

Any such declaration shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands and shall state expressly the territorial units to which the Convention applies.

### Article 41

Where a Contracting State has a system of government under which executive, judicial and legislative powers are distributed between central and other authorities within that State, its signature or ratification, acceptance or approval of, or accession to this Convention, or its making of any declaration in terms of Article 40 shall carry no implication as to the internal distribution of powers within that State.

### Article 42

Any State may, not later than the time of ratification, acceptance, approval or accession, or at the time of making a declaration in terms of Article 39 or 40, make one or both of the reservations provided for in Article 24 and Article 26, third paragraph. No other reservation shall be permitted.

Any State may at any time withdraw a reservation it has made. The withdrawal shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

The reservation shall cease to have effect on the first day of the third calendar month after the notification referred to in the preceding paragraph.

### Article 43

The Convention shall enter into force on the first day of the third calendar month after the deposit of the third instrument of ratification, acceptance, approval or accession referred to in Articles 37 and 38.

Thereafter the Convention shall enter into force –

(1)    for each State ratifying, accepting, approving or acceding to it subsequently, on the first day of the third calendar month after the deposit of its instrument of ratification, acceptance, approval or accession;

(2)    for any territory or territorial unit to which the Convention has been extended in conformity with Article 39 or 40, on the first day of the third calendar month after the notification referred to in that Article.


### Article 44

The Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 43 even for States which subsequently have ratified, accepted, approved it or acceded to it.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands at least six months before the expiry of the five year period. It may be limited to certain of the territories or territorial units to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.


### Article 45

The Ministry of Foreign Affairs of the Kingdom of the Netherlands shall notify the States Members of the Conference, and the States which have acceded in accordance with Article 38, of the following –

(1)    the signatures and ratifications, acceptances and approvals referred to in Article 37;

(2)    the accessions referred to in Article 38;

(3)    the date on which the Convention enters into force in accordance with Article 43;

(4)    the extensions referred to in Article 39;

(5)    the declarations referred to in Articles 38 and 40;

(6)    the reservations referred to in Article 24 and Article 26, third paragraph, and the withdrawals referred to in Article 42;

(7)    the denunciations referred to in Article 44.


In witness whereof the undersigned, being duly authorised thereto, have signed this Convention.

Done at The Hague, on the 25th day of October, 1980, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Kingdom of the Netherlands, and of which a certified copy shall be sent, through diplomatic channels, to each of the States Members of the Hague Conference on Private International Law at the date of its Fourteenth Session.

---

**22 USC Ch. 97: INTERNATIONAL CHILD ABDUCTION REMEDIES**

**From Title 22—FOREIGN RELATIONS AND INTERCOURSE**

---

### CHAPTER 97—INTERNATIONAL CHILD ABDUCTION REMEDIES

Sec.
9001.        Findings and declarations.
9002.        Definitions.
9003.        Judicial remedies.
9004.        Provisional remedies.
9005.        Admissibility of documents.
9006.        United States Central Authority.
9007.        Costs and fees.
9008.        Collection, maintenance, and dissemination of information.
9009.        Office of Children's Issues.
9010.        Interagency coordinating group.
9011.        Authorization of appropriations.

## §9001. Findings and declarations

**(a) Findings**

The Congress makes the following findings:

(1) The international abduction or wrongful retention of children is harmful to their well-being.

(2) Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention.

(3) International abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem.

(4) The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights. Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies. The Convention provides a sound treaty framework to help resolve the problem of international abduction and retention of children and will deter such wrongful removals and retentions.

**(b) Declarations**

The Congress makes the following declarations:

(1) It is the purpose of this chapter to establish procedures for the implementation of the Convention in the United States.

(2) The provisions of this chapter are in addition to and not in lieu of the provisions of the Convention.

(3) In enacting this chapter the Congress recognizes—

(A) the international character of the Convention; and

(B) the need for uniform international interpretation of the Convention.

(4) The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.

(Pub. L. 100–300, §2, Apr. 29, 1988, 102 Stat. 437.)

### REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original "this Act" meaning Pub. L. 100–300, Apr. 29, 1988, 102 Stat. 437, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note below and Tables.

### CODIFICATION

Section was formerly classified to section 11601 of Title 42, The Public Health and Welfare.

### SHORT TITLE OF 2004 AMENDMENT

Pub. L. 108–370, §1, Oct. 25, 2004, 118 Stat. 1750, provided that: "This Act [amending section 9006 of this title] may be cited as the 'Prevention of Child Abduction Partnership Act'."

## SHORT TITLE

Pub. L. 100–300, §1, Apr. 29, 1988, 102 Stat. 437, provided that: "This Act [enacting this chapter and amending section 663 of Title 42, The Public Health and Welfare] may be cited as the 'International Child Abduction Remedies Act'."

## §9002. Definitions

For the purposes of this chapter—

(1) the term "applicant" means any person who, pursuant to the Convention, files an application with the United States Central Authority or a Central Authority of any other party to the Convention for the return of a child alleged to have been wrongfully removed or retained or for arrangements for organizing or securing the effective exercise of rights of access pursuant to the Convention;

(2) the term "Convention" means the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980;

(3) the term "Parent Locator Service" means the service established by the Secretary of Health and Human Services under section 653 of title 42;

(4) the term "petitioner" means any person who, in accordance with this chapter, files a petition in court seeking relief under the Convention;

(5) the term "person" includes any individual, institution, or other legal entity or body;

(6) the term "respondent" means any person against whose interests a petition is filed in court, in accordance with this chapter, which seeks relief under the Convention;

(7) the term "rights of access" means visitation rights;

(8) the term "State" means any of the several States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

(9) the term "United States Central Authority" means the agency of the Federal Government designated by the President under section 9006(a) of this title.

(Pub. L. 100–300, §3, Apr. 29, 1988, 102 Stat. 437.)

### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act" meaning Pub. L. 100–300, Apr. 29, 1988, 102 Stat. 437, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note under section 9001 of this title and Tables.

### CODIFICATION

Section was formerly classified to section 11602 of Title 42, The Public Health and Welfare.

## §9003. Judicial remedies

### (a) Jurisdiction of courts

The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention.

### (b) Petitions

Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

### (c) Notice

Notice of an action brought under subsection (b) shall be given in accordance with the applicable law governing notice in interstate child custody proceedings.

### (d) Determination of case

The court in which an action is brought under subsection (b) shall decide the case in accordance with the Convention.

### (e) Burdens of proof

(1) A petitioner in an action brought under subsection (b) shall establish by a preponderance of the evidence—

(A) in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention; and

(B) in the case of an action for arrangements for organizing or securing the effective exercise of rights of access, that the petitioner has such rights.

(2) In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing—

(A) by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies; and

(B) by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.

### (f) Application of Convention

For purposes of any action brought under this chapter—

(1) the term "authorities", as used in article 15 of the Convention to refer to the authorities of the state of the habitual residence of a child, includes courts and appropriate government agencies;

(2) the terms "wrongful removal or retention" and "wrongfully removed or retained", as used in the Convention, include a removal or retention of a child before the entry of a custody order regarding that child; and

(3) the term "commencement of proceedings", as used in article 12 of the Convention, means, with respect to the return of a child located in the United States, the filing of a petition in accordance with subsection (b) of this section.

### (g) Full faith and credit

Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter.

### (h) Remedies under Convention not exclusive

The remedies established by the Convention and this chapter shall be in addition to remedies available under other laws or international agreements.

(Pub. L. 100–300, §4, Apr. 29, 1988, 102 Stat. 438.)

## REFERENCES IN TEXT

This chapter, referred to in subsecs. (f) to (h), was in the original "this Act" meaning Pub. L. 100–300, Apr. 29, 1988, 102 Stat. 437, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note under section 9001 of this title and Tables.

## CODIFICATION

Section was formerly classified to section 11603 of Title 42, The Public Health and Welfare.

## §9004. Provisional remedies

### (a) Authority of courts

In furtherance of the objectives of article 7(b) and other provisions of the Convention, and subject to the provisions of subsection (b) of this section, any court exercising jurisdiction of an action brought under section 9003(b) of this title may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition.

### (b) Limitation on authority

No court exercising jurisdiction of an action brought under section 9003(b) of this title may, under subsection (a) of this section, order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied.

(Pub. L. 100–300, §5, Apr. 29, 1988, 102 Stat. 439.)

## CODIFICATION

Section was formerly classified to section 11604 of Title 42, The Public Health and Welfare.

## §9005. Admissibility of documents

With respect to any application to the United States Central Authority, or any petition to a court under section 9003 of this title, which seeks relief under the Convention, or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court.

(Pub. L. 100–300, §6, Apr. 29, 1988, 102 Stat. 439.)

## CODIFICATION

Section was formerly classified to section 11605 of Title 42, The Public Health and Welfare.

# §9006. United States Central Authority

### (a) Designation

The President shall designate a Federal agency to serve as the Central Authority for the United States under the Convention.

### (b) Functions

The functions of the United States Central Authority are those ascribed to the Central Authority by the Convention and this chapter.

### (c) Regulatory authority

The United States Central Authority is authorized to issue such regulations as may be necessary to carry out its functions under the Convention and this chapter.

### (d) Obtaining information from Parent Locator Service

The United States Central Authority may, to the extent authorized by the Social Security Act [42 U.S.C. 301 et seq.], obtain information from the Parent Locator Service.

### (e) Grant authority

The United States Central Authority is authorized to make grants to, or enter into contracts or agreements with, any individual, corporation, other Federal, State, or local agency, or private entity or organization in the United States for purposes of accomplishing its responsibilities under the Convention and this chapter.

### (f) Limited liability of private entities acting under the direction of the United States Central Authority

#### (1) Limitation on liability

Except as provided in paragraphs (2) and (3), a private entity or organization that receives a grant from or enters into a contract or agreement with the United States Central Authority under subsection (e) of this section for purposes of assisting the United States Central Authority in carrying out its responsibilities and functions under the Convention and this chapter, including any director, officer, employee, or agent of such entity or organization, shall not be liable in any civil action sounding in tort for damages directly related to the performance of such responsibilities and functions as defined by the regulations issued under subsection (c) of this section that are in effect on October 1, 2004.

#### (2) Exception for intentional, reckless, or other misconduct

The limitation on liability under paragraph (1) shall not apply in any action in which the plaintiff proves that the private entity, organization, officer, employee, or agent described in paragraph (1), as the case may be, engaged in intentional misconduct or acted, or failed to act, with actual malice, with reckless disregard to a substantial risk of causing injury without legal justification, or for a purpose unrelated to the performance of responsibilities or functions under this chapter.

#### (3) Exception for ordinary business activities

The limitation on liability under paragraph (1) shall not apply to any alleged act or omission related to an ordinary business activity, such as an activity involving general administration or operations, the use of motor vehicles, or personnel management.

(Pub. L. 100–300, §7, Apr. 29, 1988, 102 Stat. 439; Pub. L. 105–277, div. G, title XXII, §2213, Oct. 21, 1998, 112 Stat. 2681–812; Pub. L. 108–370, §2, Oct. 25, 2004, 118 Stat. 1750.)

## REFERENCES IN TEXT

This chapter, referred to in subsecs. (b), (c), (e), and (f), was in the original "this Act" meaning Pub. L. 100–300, Apr. 29, 1988, 102 Stat. 437, as amended, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9001 of this title and Tables.

The Social Security Act, referred to in subsec. (d), is act Aug. 14, 1935, ch. 531, 49 Stat. 620, as amended, which is classified generally to chapter 7 (§301 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see section 1305 of Title 42 and Tables.

## CODIFICATION

Section was formerly classified to section 11606 of Title 42, The Public Health and Welfare.

## AMENDMENTS

**2004**—Subsec. (f). Pub. L. 108–370 added subsec. (f).
**1998**—Subsec. (e). Pub. L. 105–277 added subsec. (e).

### Ex. Ord. No. 12648. Implementation of Convention on Civil Aspects of International Child Abduction

Ex. Ord. No. 12648, Aug. 11, 1988, 53 F.R. 30637, provided:

The United States of America deposited its instrument of ratification of the Hague Convention on the Civil Aspects of International Child Abduction ("Convention") on April 29, 1988. The Convention entered into force for the United States on July 1, 1988. Article 6 of the Convention imposes upon Contracting States an obligation to designate a "Central Authority" for the purpose of discharging certain specified functions.

In order that the Government of the United States of America may give full and complete effect to the Convention, and pursuant to section 7 of the International Child Abduction Remedies Act, Public Law No. 100–300 (1988) [22 U.S.C. 9006], it is expedient and necessary that I designate a Central Authority within the Executive branch of said Government:

NOW, THEREFORE, by virtue of the authority vested in me as President by the Constitution and the laws of the United States, including section 301 of Title 3 of the United States Code and section 7 of the International Child Abduction Remedies Act, it is ordered as follows:

Section 1. *Designation of Central Authority*. The Department of State is hereby designated as the Central Authority of the United States for purposes of the Hague Convention on the Civil Aspects of International Child Abduction. The Secretary of State is hereby authorized and empowered, in accordance with such regulations as he may prescribe, to perform all lawful acts that may be necessary and proper in order to execute the functions of the Central Authority in a timely and efficient manner.

Ronald Reagan.

## §9007. Costs and fees

#### (a) Administrative costs

No department, agency, or instrumentality of the Federal Government or of any State or local government may impose on an applicant any fee in relation to the administrative processing of applications submitted under the Convention.

#### (b) Costs incurred in civil actions

(1) Petitioners may be required to bear the costs of legal counsel or advisors, court costs incurred in connection with their petitions, and travel costs for the return of the child involved and any accompanying persons, except as provided in paragraphs (2) and (3).

(2) Subject to paragraph (3), legal fees or court costs incurred in connection with an action brought under section 9003 of this title shall be borne by the petitioner unless they are covered by payments from Federal, State, or local legal assistance or other programs.

(3) Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

(Pub. L. 100–300, §8, Apr. 29, 1988, 102 Stat. 440.)

### Codification

Section was formerly classified to section 11607 of Title 42, The Public Health and Welfare.

## §9008. Collection, maintenance, and dissemination of information

#### (a) In general

In performing its functions under the Convention, the United States Central Authority may, under such conditions as the Central Authority prescribes by regulation, but subject to subsection (c), receive from or transmit to any department, agency, or instrumentality of the Federal Government or of any State or foreign government, and receive from or transmit to any applicant, petitioner, or respondent, information necessary to locate a child or for the purpose of otherwise implementing the Convention with respect to a child, except that the United States Central Authority—

(1) may receive such information from a Federal or State department, agency, or instrumentality only pursuant to applicable Federal and State statutes; and

(2) may transmit any information received under this subsection notwithstanding any provision of law other than this chapter.

**(b) Requests for information**

Requests for information under this section shall be submitted in such manner and form as the United States Central Authority may prescribe by regulation and shall be accompanied or supported by such documents as the United States Central Authority may require.

**(c) Responsibility of government entities**

Whenever any department, agency, or instrumentality of the United States or of any State receives a request from the United States Central Authority for information authorized to be provided to such Central Authority under subsection (a), the head of such department, agency, or instrumentality shall promptly cause a search to be made of the files and records maintained by such department, agency, or instrumentality in order to determine whether the information requested is contained in any such files or records. If such search discloses the information requested, the head of such department, agency, or instrumentality shall immediately transmit such information to the United States Central Authority, except that any such information the disclosure of which—

(1) would adversely affect the national security interests of the United States or the law enforcement interests of the United States or of any State; or

(2) would be prohibited by section 9 of title 13;

shall not be transmitted to the Central Authority. The head of such department, agency, or instrumentality shall, immediately upon completion of the requested search, notify the Central Authority of the results of the search, and whether an exception set forth in paragraph (1) or (2) applies. In the event that the United States Central Authority receives information and the appropriate Federal or State department, agency, or instrumentality thereafter notifies the Central Authority that an exception set forth in paragraph (1) or (2) applies to that information, the Central Authority may not disclose that information under subsection (a).

**(d) Information available from Parent Locator Service**

To the extent that information which the United States Central Authority is authorized to obtain under the provisions of subsection (c) can be obtained through the Parent Locator Service, the United States Central Authority shall first seek to obtain such information from the Parent Locator Service, before requesting such information directly under the provisions of subsection (c) of this section.

**(e) Recordkeeping**

The United States Central Authority shall maintain appropriate records concerning its activities and the disposition of cases brought to its attention.

(Pub. L. 100–300, §9, Apr. 29, 1988, 102 Stat. 440.)

## REFERENCES IN TEXT

This chapter, referred to in subsec. (a)(2), was in the original "this Act" meaning Pub. L. 100–300, Apr. 29, 1988, 102 Stat. 437, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note under section 9001 of this title and Tables.

## CODIFICATION

Section was formerly classified to section 11608 of Title 42, The Public Health and Welfare.

## §9009. Office of Children's Issues

**(a) Director requirements**

The Secretary of State shall fill the position of Director of the Office of Children's Issues of the Department of State (in this section referred to as the "Office") with an individual of senior rank who can ensure long-term continuity in the management and policy matters of the Office and has a strong background in consular affairs.

**(b) Case officer staffing**

Effective April 1, 2000, there shall be assigned to the Office of Children's Issues of the Department of State a sufficient number of case officers to ensure that the average caseload for each officer does not exceed 75.

**(c) Embassy contact**

The Secretary of State shall designate in each United States diplomatic mission an employee who shall serve as the point of contact for matters relating to international abductions of children by parents. The Director of the Office shall regularly inform the designated employee of children of United States citizens abducted by parents to that country.

**(d) Reports to parents**

**(1) In general**

Except as provided in paragraph (2), beginning 6 months after November 29, 1999, and at least once every 6 months thereafter, the Secretary of State shall report to each parent who has requested assistance regarding an abducted child overseas. Each such report shall include information on the current status of the abducted child's case and the efforts by the Department of State to resolve the case.

**(2) Exception**

The requirement in paragraph (1) shall not apply in a case of an abducted child if—

(A) the case has been closed and the Secretary of State has reported the reason the case was closed to the parent who requested assistance; or

(B) the parent seeking assistance requests that such reports not be provided.

(Pub. L. 106–113, div. B, §1000(a)(7) [div. A, title II, §201], Nov. 29, 1999, 113 Stat. 1536, 1501A-419).

### CODIFICATION

Section was enacted as part of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001, and not as part of the International Child Abduction Remedies Act which comprises this chapter.

Section was formerly classified to section 11608a of Title 42, The Public Health and Welfare.


## §9010. Interagency coordinating group

The Secretary of State, the Secretary of Health and Human Services, and the Attorney General shall designate Federal employees and may, from time to time, designate private citizens to serve on an interagency coordinating group to monitor the operation of the Convention and to provide advice on its implementation to the United States Central Authority and other Federal agencies. This group shall meet from time to time at the request of the United States Central Authority. The agency in which the United States Central Authority is located is authorized to reimburse such private citizens for travel and other expenses incurred in participating at meetings of the interagency coordinating group at rates not to exceed those authorized under subchapter I of chapter 57 of title 5 for employees of agencies.

(Pub. L. 100–300, §10, Apr. 29, 1988, 102 Stat. 441.)

### CODIFICATION

Section was formerly classified to section 11609 of Title 42, The Public Health and Welfare.


## §9011. Authorization of appropriations

There are authorized to be appropriated for each fiscal year such sums as may be necessary to carry out the purposes of the Convention and this chapter.

(Pub. L. 100–300, §12, Apr. 29, 1988, 102 Stat. 442.)

### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act" meaning Pub. L. 100–300, Apr. 29, 1988, 102 Stat. 437, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note under section 9001 of this title and Tables.

### CODIFICATION

Section was formerly classified to section 11610 of Title 42, The Public Health and Welfare.

(Copy for OCRG)

Mun. Form No. 102
(Revised January 1993)

(To be accomplished in quadruplicate)

**REMARKS/ANNOTATION**

Republic of the Philippines
OFFICE OF THE CIVIL REGISTRAR GENERAL
# CERTIFICATE OF LIVE BIRTH

(Fill out completely, accurately and legibly. Use ink or typewriter.
Place X before the appropriate answer in items 2, 5a, 6b and 19a.)

| Province | Metro Manila | | |
|---|---|---|---|
| City/Municipality | Pasay City | Registry No. | 2009-8170 |

**CHILD**

**1. NAME**  (First) ▉  (Middle) ▉  (Last) ▉

For OCRG USE ONLY:
Population Reference No.

**2. SEX** — 1 Male — X 2 Female   **3. DATE OF BIRTH** (day) (month) (year) ▉

TO BE FILLED UP AT THE
OFFICE OF THE CIVIL
REGISTRAR

**4. PLACE OF BIRTH** (Name of Hospital/Clinic/Institution / House No., Street, Barangay) (City/Municipality) (Province)
San Juan De Dios Educational Foundation Inc.,Pasay City

41

**5a. TYPE OF BIRTH** — X 1 Single — 2 Twin — 3 Triplet, etc.   **b. IF MULTIPLE BIRTH, CHILD WAS** — 1 First — 2 Second — 3 Others, Specify

48

**c. BIRTH ORDER** (five births and fetal deaths including this delivery) (first, second, third, etc.)  1st   **d. WEIGHT AT BIRTH**  2,610 grams

49  50

**MOTHER**

**6. MAIDEN NAME** (First) Arlene  (Middle) Villanueva  (Last) Castillo

**7. CITIZENSHIP**  Filipino   **8. RELIGION**  Iglesia ni Cristo

58

**9a.** Total number of children born alive: 1   **b.** No. of children still living including this birth: 1   **c.** No. of children born alive but are now dead: 0

**10. OCCUPATION**  Analyst Programmer   **11.** Age at the time of this birth: 29

62  64

**12. RESIDENCE** (House No., Street, Barangay) (City/Municipality) (Province)
3511 Hilario St. Palanan, Makati City

**FATHER**

**13. NAME** (First) Gerome  (Middle) Santos  (Last) Cuevas

65  66

**14. CITIZENSHIP**  Filipino   **15. RELIGION**  Iglesia ni Cristo

**16. OCCUPATION**  Hotel Supervisor   **17.** Age at the time of this birth: 33 years

70  72  74

**18. DATE AND PLACE OF MARRIAGE OF PARENTS** (If not married, accomplish Affidavit of Acknowledgment/Admission of Paternity at the back)
January 19, 2009 , Makati City

76  79

**19a. ATTENDANT** — 1 Physician — 2 Nurse — 3 Midwife — 4 Hilot (Traditional Midwife) — 5 Others (Specify)

**19b. CERTIFICATION OF BIRTH**
I hereby certify that I attended the birth of the child who was born alive at 12:16 AM o'clock am/pm on the date stated above.

81

Signature
Name in Print  Dexter Uy Andres, MD.
Title or Position  OB Gynecologist

Address  Pasay City RM
Date  26 October 2009

86  87

**20. INFORMANT**
Signature
Name in Print  Gerome B. Cuevas
Relationship to the child  Father

Address  3511 Hilario St. Pac lanan, Makati City
Date  26 October 2009

83  91

**21. PREPARED BY**
Signature
Name in Print  Darlyn Medina-de Leon
Title or Position  Medical Records Clerk

**22. RECEIVED AT THE OFFICE OF THE CIVIL REGISTRAR**
Signature

93  94

SUKHWINDER MANDER
CONSTABLE OF POLICE - 162
211 BANK STREET
SOUTH MELBOURNE - 3205

05462-66-003MTH-00558-BI00

BEST POSSIBLE IMAGE

T00305462003005581215201400 2

ORIGINAL CERTIFICATE
DOCUMENT(S) WHICH I HAVE SIGHTED

THIS DAY
NAME:
RANK:

SOUTH MELBOURNE
POLICE STATION
211 Bank Street
South Melbourne 3205
(03) 9257 3800

Lisa Grace S. Bersales
**LISA GRACE S. BERSALES, Ph.D.**
National Statistician and Civil Registrar General
Philippine Statistics Authority

Documentary
Stamp Tax Paid

**Carlton Gardens Primary School**
No. 2605
215 Rathdowne Street, Carlton 3053
Phone:  9663 6502
Fax:  9639 1220
e-mail: carlton.gardens.ps@edumail.vic.gov.au
web address: www.carltongardens.vic.edu.au

7/11/2016

To whom it may concern,

T████ C█████ attended Carlton Gardens Primary School from 29 April 2015 until 21 August 2015.

Yours sincerely

Tina McDougall
Principal



**FSC**

Mixed Sources

Cert no. SW-COC-002980
www.fsc.org
© 1996 Forest Stewardship Council

# YOUR MEMBERSHIP CERTIFICATE



**About your cover**

| | |
|---|---|
| Membership Number: | 96599576 |
| Your Cover: | Essential Plus Visitors Cover |
| Membership Type: | Family |

Who's covered and date of births:

| | |
|---|---|
| Arlene Cuevas | 28 February 1980 |
| Gerome Cuevas | 10 January 1976 |
| T████ C█████ | 26 October 2009 |

Cover Start Date:                          8 March 2015

**Your premium details**

Normal premium for your cover:

$238.51 Monthly
The rate quoted includes a 10% Goods and Services Tax (GST) on your hospital cover. GST does not apply to your extras cover.

**Your regular payment details**

Payment Type:                          Cash/Cheque



**FSC**

**Mixed Sources**

**Cert no. SW-COC-002980**
**www.fsc.org**
**© 1996 Forest Stewardship Council**

**International Social Service**
**AUSTRALIA**
ABN: 12 004 508 641

21 July 2016

Department of Immigration and Border Protection

GPO Box 241

Melbourne VIC 3001

request.movement@border.gov.au

To whom it may concern,

**Re. International movement record request for T█████ C██████ (DOB: ██████████)**

I write in support my client, **Ms Arlene CUEVAS** of 301/221 Sturt St, Southbank, VIC 3006, who is seeking an international movement record for her daughter, T█████ C██████ (DOB ██████████) as a matter of urgency.

Ms Cuevas is receiving legal and social work support from International Social Service Australia regarding the abduction of her daughter T█████ in late 2015, by her husband **Gerome CUEVAS**. Ms Cuevas assumes that Mr Cuevas took Tippee to the Philippines, their native country, however as she has not been able to contact her husband or her daughter since October 2015 she has not been able to confirm their whereabouts.

Ms Cuevas is concerned for T█████'s welfare and I would like to request that her application for T█████'s international movement record be expedited so that she can be assisted to locate her daughter as soon as possible.

Ms Cuevas does not have access to her daughter's original birth certificate as this was taken by Mr Cuevas. Therefore she is unable to provide a certified copy of the birth certificate at this time.

I thank you for your consideration of this request.

Regards,

*[signature]*

Siobhan Kavanagh

Senior Social Worker

International Social Service Australia

Ph: 03 9614 8755

siobhan.kavanagh@iss.org.au

**National Office**
Level 2, 313-315 Flinders Lane
Melbourne, VIC 3000
Australia
T: (+61) 3 9614 8755
F: (+61) 3 9614 8766
E: iss@iss.org.au

**NSW Office**
Level 1, 518 Kent Street
Sydney, NSW 2000
Australia
T: (+61) 2 9267 0300
F: (+61) 2 9267 3886
E: issnsw@iss.org.au

**QLD Office**
PO BOX 534
West End, QLD 4101
Australia
T: (+61) 7 3255 2675
F: (+61) 2 9267 3886
E: issqld@iss.org.au

1300 657 843
www.iss.org.au

**Defending** children • **connecting** families • across the **world**

**CASE SUMMARY**



International
**Social Service**
A U S T R A L I A

ABN: 12 004 508 641

**1.   Brief explanation of the current situation and need for intervention:**

**Arlene Cuevas** is receiving support from International Social Service Australia regarding the abduction of her daughter T████ C████ in late 2015, by her husband **Gerome Cuevas**. Arlene assumes that Gerome took T████ to the Philippines, their native country, however as she has not been able to contact her husband or her daughter since October 2015 she has not been able to confirm their whereabouts.

ISS Australia is seeking the assistance of ISS Philippines to locate Gerome and T████, and if appropriate, contact Gerome to discuss T████'s best interests.

**2.   Persons involved in Philippines**

| Name | Gerome CUEVAS (father of T████) |
|---|---|
| Sex | Male |
| Date of Birth | 10 January 1976 |
| Place of Birth | Philippines |
| Nationality | Philippines |
| Religion | Iglesia Ni Cristo |
| Profession | |
| Address | Known residential address: |
| | 38 Pao Street, Sta. Mesa Heights, Quezon City, Philippines 1114 |
| | Known relatives residing in the same compound: |
| | 1. Alfredo "Deng" Delos Santos Cuevas II (older brother) |
| | 2. Lorna Cuevas-Lorenzo (aunt) - +63 915 702 4863 or +63 (2) 412 6148 |
| | They are both listed/registered in this church congregation: |
| | Iglesia Ni Cristo - La Loma Congregation |
| | 98 Bulusan Street corner Angelo Street |
| | La Loma, Quezon City |
| | Tel: +63 (2) 740 2357 |
| | Other possible locations and relatives: |
| | 1. Barangay Pulong Buhangin, Santa Maria, Bulacan. This is where Gerome's maternal relatives reside. They are also active members of |

**Defending** children • **connecting** families • across the **world**

the same church.

Known relative: Leilani Reyes Celestino (cousin)

Residential address is unknown but best option is the church congregation in Pulong Buhangin (no phone number listed) where she is most likely listed in.

2. Santa Cruz, Lubao, Pampanga

Known relative: Laarni Cuevas Mabagos (cousin) - Last known to run a gift shop (Love Ko gift shop along Gapan-Olongapo road). Residential address is unknown.

She is most likely listed in Iglesia Ni Cristo Santa Cruz-Lubao Congregation (no phone number listed)

Address:

Gapan Olongapo Road, Barangay Santa Cruz,

Lubao, Pampanga


Below are possible church congregations where Gerome could be listed.

1. Iglesia Ni Cristo Central Temple - This is also where the church's central secretariat office is located.

Address:

1 Central Avenue, New Era, Diliman

Quezon City, Philippines

Tel: +63 (2) 924 4311


2. Iglesia Ni Cristo - San Francisco Congregation

Address:

433 Del Monte Avenue, San Francisco del Monte,

Quezon City, Philippines

Tel: +63 (2) 374 4405

| Name | T███ C██████ (daughter of Gerome and Arlene Cuevas) |
|---|---|
| Sex | Female |
| Date of Birth | ████████████ |
| Place of Birth | Philippines |
| Nationality | Philippines |
| Religion | Iglesia Ni Cristo |
| Profession | Not applicable |
| Address | See above |

### 3. Persons concerned in Australia

| Name | Arlene Cuevas (mother of T█████) |
|---|---|
| Sex | Female |
| Date of Birth | 28 February 1980 |
| Place of Birth | Philippines |
| Nationality | Philippines |
| Religion | Formerly Iglesia Ni Cristo |
| Profession | IT professional |
| Address | 301/221 Sturt St, Southbank, Victoria, Australia 3006 |

### 4. Situation

Arlene, Gerome and T█████ C██████ migrated to Australia in 2015. The couple had some marital problems prior to their migration which continued once in Australia, including some incidents of physical violence by Gerome towards Arlene, and ongoing emotional and verbal abuse, which their daughter T█████ witnessed.

Arlene became increasingly scared of Gerome and she talked to him about separation in August 2015. She reports that he became angry and violent, and soon after he left for the Philippines, taking T█████ with him.

Gerome had conversations with Arlene about returning to Australia, however he stopped communication in October 2015. Arlene has not had contact with Gerome or T█████ since then. She is unsure of their whereabouts, although she believes they are in the Philippines. From social media, it appears that Gerome and T█████ may have recently been in Singapore, perhaps for a holiday.

Arlene stated that she is reluctant to seek support or assistance from her family as she feels that her and her family's reputation and membership of their church (Iglesia Ni Cristo) would be jeopardised if the church finds out about the marital problems.

We request that ISS Philippines proceeds cautiously and sensitively if any contact with the church is made.

Arlene is concerned for T█████ welfare and would like to regain contact with her. She would like Gerome to allow T█████ to return to Australia to live with her.

**5.   Service requested**

ISS Australia requests ISS Philippines to:

- Try to locate Gerome and T█████ C█████ in Philippines. Please inform Philippines police about T█████'s situation and request their advice on how to locate them, if required.

- Please consult with ISS Australia before contacting Gerome so that we can discuss with Arlene the best approach.

- If it is agreed with ISS Australia to contact Gerome, please try to engage him in a discussion of T█████ best interests and her right to have contact with her mother, Arlene.

- If engaging with the Iglesia Ni Cristo, please be aware of the sensitivities and the possibility that they may not be helpful with enquiries.

Thank you in advance for your assistance.

Kind regards,

Siobhan Kavanagh

Senior Social Worker

ISS Australia

siobhan.kavanagh@iss.org.au

**National Office**
Level 2, 313-315 Flinders Lane,
Melbourne Vic 3000, Australia

**T**: (+61) 3 9614 8755
**F**: (+61) 3 9614 8766
**Toll Free**: 1300 657 843
**E**: iss@iss.org.au

**NSW Office**
Level 1, 518 Kent Street,
Sydney NSW 2000, Australia

**T**: (+61) 2 9267 0300
**F**: (+61) 2 9267 3886
**E**: issnsw@iss.org.au

**www.iss.org.au**

## APPLICATION FOR THE RETURN OF A CHILD

**APPLICATION IN ACCORDANCE WITH THE HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION FOR THE RETURN OF A CHILD WRONGFULLY REMOVED OR RETAINED FROM AUSTRALIA**

| REQUESTING CENTRAL AUTHORITY OR APPLICANT: | REQUESTED AUTHORITY: |
|---|---|
| **Australia** | **United States of America** |

Concerns the following child    T~~████~~ C~~████~~

who will attain the age of 16 on    ~~████████████~~

NOTE:  The following particulars should be completed insofar as possible.

### I—IDENTITY OF THE CHILD AND ITS PARENTS

**1    Child**

| name and first names | C~~████~~, T~~████~~ ~~████~~ |
|---|---|
| date and place of birth | ~~████████████~~, Philippines |
| habitual residence before removal or retention | Victoria, Australia |
| passport or identity card no., if any | EB4612900 |
| description and photo, if possible (see annexes) | Tall and slim with wavy hair. Medium skin complexion. See photo attached |

**2    Parents**

**2.1  Mother:**

| name and first names | CUEVAS, Arlene Castillo |
|---|---|
| date and place of birth | 28 February 1980, Philippines |
| nationality | Filipino |
| occupation | Information Technology professional |
| habitual residence | Victoria, Australia |

## III—PLACE WHERE THE CHILD IS THOUGHT TO BE

| 4.1 Information concerning the person alleged to have removed or retained the child | |
|---|---|
| name and first names | **CUEVAS, Gerome Santos** |
| date and place of birth, if known | 10 January 1976, Philippines |
| nationality, if known | Filipino |
| occupation | Unable to confirm |
| last known address | United States of America '(most likely in New York where most of his relatives live) |
| passport or identity card no., if any | EB4791881 |
| description and photo, if possible (see annexes) | Tall, medium built. Medium skin completion See photo attached |
| 4.2   Address of the child | United States of America, Location unknown |
| 4.3   Other persons who might be able to supply additional information relating to the whereabouts of the child | 1. Ylaine Pablo (1125 46th Rd, Long Island City, NY 11101) 2. Leilani Mananghaya (86-23 77th Street, Queens, NY) 3. Noel Mananghaya (86-23 77th Street, Queens, NY) |

## IV—TIME, PLACE, DATE AND CIRCUMSTANCES OF THE WRONGFUL REMOVAL OR RETENTION

On 23 August 2015, Gerome and I argued. At the end of that argument, Gerome left our family home and took our daughter T████ with him. Gerome then removed T████ from Australia without my knowledge or consent, taking her to Philippines.

I had some contact over the telephone with Gerome and T████ until approximately September 2015, when all attempts at contacting Gerome and Tippee failed.

I have been attempting to locate Gerome and T████ since October 2015 but have been unsuccessful.

I now have reason to believe that that they are in the United States of America. The basis for this belief is outlined in my supporting affidavit of fact.

# V—FACTUAL OR LEGAL GROUNDS JUSTIFYING THE REQUEST

- I am the mother of T████ C████, born ██████████.

- T████ is under 16 years of age.

- Both Australia and United States are signatories to the *Hague Convention on the Civil Aspects of International Child Abduction* (the Convention).

- Section 61C of the Australian *Family Law Act 1975* (the Family Law Act) provides that as T████s mother, I have parental responsibility for her.

- Section 111B (4) of the Family Law Act clarifies that parental responsibility is to be interpreted as rights of custody for the purposes of the Convention.

- The rights which I hold include the right to

  o care for and spend time with T████,

  o be informed about her life, and

  o be involved in decisions affecting her life including the decision about where she will live.

- The rights which I have under Australian law are explained in section 61B of the Family Law Act. I have set out the provisions of that section below.

---

**FAMILY LAW ACT 1975 - SECT 61B**
**Meaning of parental responsibility**
In this Part, *__parental responsibility__* , in relation to a <u>child</u>, means all the duties, powers, responsibilities and authority which, by law, <u>parents</u> have in relation to <u>children</u>

---

- No orders have been made under the Family Law Act

- I was exercising my rights of custody at the time Tippee was wrongfully removed to the United States of America.
- I have not consented to T████ being taken to United States of America and I have not subsequently acquiesced to her remaining in the United States of America.
- If the court were to order that T████ return to Australia she would return to her former home and would not be exposed to any grave risk of physical or psychological harm nor would her return otherwise place her in an intolerable situation.
- I do not believe that T████ would object to return to Australia and in any event at her young age, she has not reached sufficient maturity for her wishes to determine the issue of where she is to live.
- Ordering that T████ returns to Australia would not be contrary to any fundamental principles of human rights in either United States or Australia.

## VI—CIVIL PROCEEDINGS IN PROGRESS

Nil

## VII—CHILD IS TO BE RETURNED TO:

| a | name and first names | CUEVAS, Arlene Castillo |
| --- | --- | --- |
| | date and place of birth | 28 February 1980, Philippines |
| | Address | 301/221 Sturt St, Southbank VIC 3006 |
| | Telephone number | 0470 397 612 |
| b | proposed arrangements for return of the child | I am prepared to pay for the flights and to travel to the USA to accompany T████ home to Australia |

## VIII—OTHER REMARKS

## IX—LIST OF DOCUMENTS ATTACHED

1. Certified copy of birth certificate for T█████ C█████
2. Photograph of T█████ C█████
3. Photograph of Gerome Cuevas
4. Passport for Arlene, Gerome and T█████ C█████

I authorise the requested Central Authority and its agents to act on my behalf and to do all things reasonable and necessary in connection with this application.

Date _____ 10 February 2017 _____

Place _____ Melbourne _____

Signature of Applicant _____
(and/or stamp of the requesting Central Authority)

* e.g.  Certified copy of relevant decision or agreement concerning rights of custody or rights of access; certificate or affidavit as to the applicable law; information relating to the social background of the child; authorization empowering the Central Authority to act on behalf of applicant.

## Fwd: Hague Convention Case - Retained Attorney Package - Cuevas (Australia)

Robert D. Arenstein [arensteinlaw@aol.com]
**Sent:** Thursday, August 10, 2017 9:30 PM
**To:**

Sent from my iPhone

Begin forwarded message:

> **From:** "Robert D. Arenstein" <arensteinlaw@aol.com>
> **Date:** August 10, 2017 at 9:28:26 PM EDT
> **To:**
> **Subject: Fwd: Hague Convention Case - Retained Attorney Package - Cuevas (Australia)**

Sent from my iPhone

Begin forwarded message:

> **From:** "Satchell, Stephanie A" <SatchellSA@state.gov>
> **Date:** August 8, 2017 at 11:05:28 AM EDT
> **To:** "'arensteinlaw@aol.com'" <arensteinlaw@aol.com>
> **Cc:** "Weiss, Robert J" <WeissRJ@state.gov>, "Washabaugh, Rebecca F" <WashabaughRF@state.gov>
> **Subject: RE: Hague Convention Case - Retained Attorney Package - Cuevas (Australia)**

Good Morning Mr. Arenstein,

We are sending the following address for service of process purposes. Our most recent records indicate that the child is residing at 11-47 45th Ave. Apt. 2 Long Island City, NY 11101. Please confirm this information with me before service of process is attempted. Looking forward to hearing about the progress of this case.

If you have any questions or concerns, please feel free to contact me. Thank you very much and hope you have a great day.



**Stephanie Satchell**
Acting Country Officer
CA/OCS/CI
U.S. Department of State
Phone: 202-485-6337
Email: SatchellSA@state.gov

**Official - Privacy/PII**
**UNCLASSIFIED**

10/1/2017                    Fwd: H.      Convention Case - Retained Attorney Package - Cue      (Australia)

**From:** Satchell, Stephanie A
**Sent:** Wednesday, August 02, 2017 10:06 AM
**To:** 'arensteinlaw@aol.com'
**Cc:** Weiss, Robert J
**Subject:** Hague Convention Case - Retained Attorney Package - Cuevas (Australia)

Dear Mr. Arenstein:

Please find attached the Hague application and supporting documents for the ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮Hague Convention case. Documents concerning U.S. visa and passport information have been omitted, please ask the applicant-parent to provide you with these documents if necessary.

Please confirm receipt of this e-mail.



**Stephanie Satchell**
Acting Country Officer
CA/OCS/CI
U.S. Department of State
Phone: 202-485-6337
Email: SatchellSA@state.gov

**Official - Privacy/PII**
**UNCLASSIFIED**